**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| **ANDRE CRAVENS and TAMARA GREEN,** on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**GARDAWORLD SECURITY SERVICES, INC.,**<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Andre Cravens and Tamara Green ("Plaintiffs"), through their attorneys, individually and on behalf of all others similarly situated, bring this Class Action Complaint against Defendant GardaWorld Security Services, Inc. ("GardaWorld" or "Defendant"), and its present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiffs allege the following on information and belief—except as to their own actions, counsel's investigations, and facts of public record.

## NATURE OF ACTION

1. This class action arises from Defendant's failure to protect highly sensitive data.

2. Defendant is a security-services company within the GardaWorld group, providing security services throughout the United States.[1]

3. As such, Defendant stores a litany of highly sensitive personally identifiable information ("PII") about individuals, including current and former employees. On information and belief, Defendant lost control over that data when cybercriminals infiltrated its insufficiently

---

[1] GardaWorld Security, Contact Us, https://www.garda.com/contact (last visited October 21, 2026).

protected computer systems in a data breach publicly reported in October 2026 (the "Data Breach").

4. It is unknown for precisely how long the cybercriminals had access to Defendant's network before the Data Breach was discovered. On information and belief, Defendant failed to use effective means to prevent, detect, stop, or mitigate unauthorized access to its systems and the PII maintained there.

5. On information and belief, cybercriminals were able to breach Defendant's systems because Defendant failed to adequately train its employees on cybersecurity and failed to maintain reasonable security safeguards or protocols to protect the Class's PII. In short, Defendant's failures placed the Class's PII in a vulnerable position—rendering them easy targets for cybercriminals.

6. Plaintiffs are Data Breach victims whose PII, on information and belief, was compromised in the Data Breach. They bring this class action on behalf of themselves and all others harmed by Defendant's misconduct.

7. The exposure of one's PII to cybercriminals is a bell that cannot be unrung. Information entrusted to Defendant for limited purposes has, on information and belief, been exposed to unauthorized persons and can no longer be considered secure.

## PARTIES

8. Plaintiff Andre Cravens is a natural person and a citizen of Indiana. He resides in Mishawaka, Indiana, where he is domiciled and intends to remain.

9. Plaintiff Tamara Green is a natural person and a citizen of Texas. She resides in Fort Worth, Texas, where she is domiciled and intends to remain.

10. Defendant GardaWorld Security Services, Inc. is a corporation incorporated under the laws of Missouri, with its principal place of business at 1699 South Hanley Road, Suite 350, St. Louis, Missouri 63144.[2]

11. On information and belief, Defendant maintained, processed, or controlled Plaintiffs' and Class Members' PII within the GardaWorld network environment implicated in the Data Breach, including information obtained through related GardaWorld businesses. Defendant's responsibilities for that information included safeguarding it against unauthorized access and disclosure.

**JURISDICTION AND VENUE**

12. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). On information and belief, the amount in controversy exceeds $5 million, exclusive of interest and costs, and there are over 100 putative Class Members. Plaintiffs are citizens of Indiana and Texas, respectively, and Defendant is a citizen of Missouri under 28 U.S.C. § 1332(c)(1). Thus, minimal diversity exists.

13. This Court has personal jurisdiction over Defendant because Defendant is incorporated in Missouri, is headquartered in Missouri, and regularly conducts business in Missouri.

14. Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (2) because Defendant resides in this District and maintains its principal office here and, on information and belief, a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred

[2] Florida Department of State, Division of Corporations, GardaWorld Security Services, Inc., Document No. F25000004032, 2026 Annual Report (filed February 23, 2026), https://search.sunbiz.org/Inquiry/CorporationSearch/ByName (last visited October 21, 2026).

in this District, including decisions concerning the collection, maintenance, and protection of the PII at issue.

## BACKGROUND

***Defendant Collected and Stored the PII of Plaintiffs and the Class***

15. Defendant provides security services in the United States as part of the GardaWorld group.

16. As part of its business, Defendant receives and maintains the PII of thousands of individuals, including current and former employees. On information and belief, it also processes or maintains PII in connection with the operations of related GardaWorld businesses.

17. In collecting and maintaining the PII, Defendant agreed it would safeguard the data in accordance with its internal policies, state law, and federal law. After all, Plaintiffs and Class Members themselves took reasonable steps to secure their PII.

18. Under state and federal law, businesses like Defendant have duties to protect the PII entrusted to them and to notify affected individuals about breaches.

19. GardaWorld recognizes these duties. Its published Privacy Notice is issued on behalf of the GardaWorld group and describes safeguards for personal information processed by the relevant group company.[3]

a. The Privacy Notice states: "We have implemented appropriate security measures." It describes safeguards against unauthorized access and disclosure, limits on access to personal data, and procedures for responding

---

[3] GardaWorld, Privacy Notice, https://www.gardaworld.com/privacy-notice (last visited October 21, 2026).

to suspected breaches. It also explains that GardaWorld requires group companies to follow common rules when processing personal data.[4]

***Defendant's Data Breach***

20. On or about October 19, 2026, the ransomware group Qilin publicly identified GardaWorld on its data-leak site. Public threat-intelligence reporting recorded that listing as involving the garda.com domain.[5]

21. On information and belief, cybercriminals gained unauthorized access to Defendant's network environment and obtained files containing PII. The precise dates of initial access, exfiltration, and discovery are within Defendant's knowledge and will be established through discovery.

22. On information and belief, the PII compromised in the Data Breach includes the categories of sensitive information Defendant and related GardaWorld businesses collect and retain, including:

a. Names;

b. Contact information and addresses;

c. Dates of birth;

d. Social Security numbers;

e. Driver's license numbers; and

f. Financial information.

---

[4] Id. §§ 6–7.

[5] GardaWorld Ransomware Attack by Qilin (2026), Cyber Threat Intelligence, https://cyberthreatintelligence.net/ransomware-victim/gardaworld-qilin-2026 (last visited October 21, 2026).

23. Currently, the precise number of persons injured is unclear. But upon information and belief, the size of the putative Class can be ascertained from information in Defendant's custody and control. And upon information and belief, the putative Class is over one hundred members, given the scope of Defendant's operations and the volume of personal information it maintains.

24. As of October 21, 2026, Plaintiff Cravens had not received a notice from Defendant concerning the Data Breach.

25. Without notice identifying the affected information and the scope of the intrusion, Plaintiff Cravens has been deprived of information needed to take prompt and informed measures to protect his PII. The date on which Defendant learned of the intrusion and its resulting notice obligations will be established through discovery.

26. Defendant failed its duties when its inadequate security practices caused the Data Breach. In other words, Defendant's negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from accessing the PII. And thus, Defendant caused widespread injury and damages.

27. Defendant has not provided Plaintiff Cravens with an explanation of the security failures that allowed the Data Breach or the measures taken to prevent additional exposure of his PII.

28. Without adequate safeguards, Plaintiffs' and Class Members' PII remains vulnerable to additional exposure while it is retained in Defendant's systems.

29. Because of Defendant's Data Breach, the sensitive PII of Plaintiffs and Class Members was placed into the hands of cybercriminals—inflicting numerous injuries and significant damages upon Plaintiffs and Class Members.

30. This incident follows a separate data breach involving GardaWorld's cash-services business in 2023, which resulted in notices and litigation in 2024. That earlier incident placed the GardaWorld group on notice of the risks associated with retaining sensitive personal information. This action concerns the separate Data Breach publicly reported in October 2026.[6]

***Qilin and the Dark Web***

31. The cybercriminal group publicly claiming responsibility for the Data Breach is Qilin. Its public identification of GardaWorld as a victim is consistent with an extortion campaign involving the threatened disclosure of stolen information.[7]

32. As explained by the global cybersecurity firm BlackFog, the *modus operandi* of cybercriminals like Qilin is to exfiltrate private information through a data breach and then "post it on forums on the Dark Web where it will be sold for profit."[8]

33. Indeed, the Federal Trade Commission has explained that "data stolen from businesses ends up on the dark web where criminals buy and sell it to commit fraud, get fake identity documents, or fund their criminal organizations."[9]

34. Thus, on information and belief, the PII of Plaintiffs and the Class obtained in the Data Breach is in the possession of cybercriminals and is subject to unauthorized disclosure, sale, and misuse, including through the Dark Web.

---

[6] See Complaint, Cravens v. Garda CL Southeast, Inc., et al., No. 9:24-cv-80400 (S.D. Fla. 2024).
[7] GardaWorld Ransomware Attack by Qilin (2026), supra.
[8] Brenda Robb, *After the Data Breach – What Happens to Your Data*, BLACKFOG (July 27, 2025) https://www.blackfog.com/after-the-data-breach-what-happens-to-your-data/.
[9] John Krebs, *The dark web: What your business needs to know*, FED. TRADE COMM. (Oct. 17, 2017) https://www.ftc.gov/business-guidance/blog/2017/10/dark-web-what-your-business-needs-know.

***Plaintiff Andre Cravens's Experiences and Injuries***

35. Plaintiff Cravens previously worked for GardaWorld's cash-services business as a Cash Messenger. His employment ended in approximately June 2021.

36. In connection with that employment, Plaintiff Cravens provided GardaWorld with his name, contact information, address, date of birth, Social Security number, driver's license number, and financial information. On information and belief, Defendant obtained and continued to maintain that information within the GardaWorld network environment.

37. On information and belief, Plaintiff Cravens's PII was among the records compromised in the Data Breach.

38. Plaintiff Cravens provided his PII in connection with his employment and trusted that reasonable measures would be used to protect it according to applicable policies, as well as state and federal law. On information and belief, Defendant continued to maintain his PII after his employment ended and had a continuing duty to safeguard it from unauthorized access and disclosure.

39. Plaintiff Cravens reasonably understood that a portion of the funds derived from his employment would be used to pay for adequate cybersecurity and protection of his PII.

40. Plaintiff Cravens was also affected by the earlier GardaWorld cash-services data breach addressed in the 2024 litigation. The injuries alleged here arise from the separate October 2026 Data Breach.

41. Plaintiff Cravens had not received a notice concerning this Data Breach as of October 21, 2026.

42. Plaintiff Cravens has spent approximately fifteen minutes discussing this Data Breach and its effect on his information with counsel. He anticipates spending additional time and effort protecting himself against misuse of his PII.

43. Following the Data Breach, Plaintiff Cravens received spam calls at the telephone number he had provided to GardaWorld and an increase in emails. On information and belief, the exposure of his contact information in the Data Breach contributed to those unwanted communications.

44. Plaintiff Cravens suffered actual injury from the exposure and theft of his PII, including the loss of privacy and control over his sensitive information.

45. Plaintiff Cravens suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that Defendant was required to adequately protect.

46. As a former employee of the GardaWorld cash-services business, Plaintiff Cravens lost the benefit of the data-security undertaking associated with the provision and retention of his employment-related PII. He supplied that information with the understanding that it would be reasonably protected and used only for authorized purposes.

47. Plaintiff Cravens suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft because the Data Breach placed his PII in the hands of criminals.

48. Plaintiff Cravens has a continuing interest in ensuring that his PII—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

***Plaintiff Tamara Green's Experiences and Injuries***

49. On information and belief, Defendant obtained and maintained Plaintiff Green's PII in connection with GardaWorld's business operations.

50. On information and belief, Plaintiff Green's PII was included in the records compromised in the Data Breach.

51. Plaintiff Green entrusted her information for legitimate business purposes with the expectation that it would remain confidential and be protected against unauthorized access and disclosure. On information and belief, Defendant continues to retain that information and has a continuing duty to safeguard it.

52. Plaintiff Green suffered actual injury from the unauthorized exposure of her PII, including the loss of privacy and control over her personal information.

53. Plaintiff Green suffered actual injury in the form of damages to and diminution in the value of her PII, which Defendant was required to adequately protect.

54. Because of the Data Breach, Plaintiff Green faces a substantially increased risk of fraud, misuse, and identity theft and the resulting need to remain vigilant against misuse of her PII.

55. Plaintiff Green has a continuing interest in ensuring that her PII—which, upon information and belief, remains in Defendant's possession—is protected and safeguarded from additional breaches.

***Consumers Prioritize Data Security***

56. In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[10] Therein, Cisco reported the following:

---

[10] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited March 19, 2025).

a. "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data."[11]

b. "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[12]

c. 89% of consumers stated that "I care about data privacy."[13]

d. 83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[14]

e. 51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[15]

f. 75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[16]

***Plaintiffs and the Proposed Class Suffered Common Injuries and Damages***

57. Because of Defendant's failure to prevent the Data Breach, Plaintiffs and Class Members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an

[11] *Id*. at 3.
[12] *Id*.
[13] *Id*. at 9.
[14] *Id*.
[15] *Id*.
[16] *Id*. at 11.

increased risk of suffering:

a. loss of the opportunity to control how their PII is used;

b. diminution in value of their PII;

c. compromise and continuing publication of their PII;

d. out-of-pocket costs from trying to prevent, detect, and recover from identity theft and fraud;

e. lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identity theft and fraud;

f. delay in receipt of tax refund monies;

g. unauthorized use of their stolen PII; and

h. continued risk to their PII—which remains in Defendant's possession—and is thus at risk for future breaches so long as Defendant fails to take appropriate measures to protect the PII.

***Substantially Increased Risk of Identity Theft and Fraud***

58. Plaintiffs and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach.

59. Federal regulations define identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201.

60. The same regulations describe "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, Social Security number, date of birth, official State or government issued

driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id*.

61. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal individuals' personal data to monetize the information. Criminals monetize the data by selling the stolen information on the internet black market (aka the Dark Web) to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

62. The "Dark Web" is an unindexed layer of the internet that requires special software or authentication to access.[17] Criminals in particular favor the Dark Web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, Dark Web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the Dark Web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[18] This prevents Dark Web marketplaces from being easily monitored by authorities or accessed by those not in the know.

63. The unencrypted PII of Plaintiffs and Class Members has or will end up for sale on the Dark Web because that is the modus operandi of hackers. In addition, unencrypted and detailed PII may fall into the hands of companies that will use it for targeted marketing without the approval of Plaintiffs and Class Members. Unauthorized individuals can easily access the Plaintiffs' and Class Members' PII.

64. Theft of Social Security numbers also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new number, a breach

[17] *What Is the Dark Web?*, EXPERIAN, https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/ (last visited July 9, 2025).
[18] *Id*.

victim has to demonstrate ongoing harm from misuse of their SSN, and a new SSN will not be provided until after the victim has suffered the harm.

65. In particular, the theft of Social Security numbers—in combination with other PII (e.g., name, address, date of birth)—provides cybercriminals with a "skeleton key" to commit rampant fraud and identity theft.

66. For example, cybersecurity expert Jim Stickley explained to Time Magazine that "[i]f I have your name and your Social Security number, and you haven't gotten a credit freeze yet, you're easy pickings . . . With that, you can do whatever you want . . . You can become that person."[19] For context, Jim Stickley is a "penetration tester" who is employed by businesses "to infiltrate their systems in order to find flaws they can fix before the bad guys exploit them."[20]

67. There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. Fraud and identity theft resulting from the Data Breach may go undetected until debt collection calls commence months, or even years, later. An individual may not know that their Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

---

[19] Patrick L. Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME MAGAZINE (Aug. 5, 2019) https://time.com/5643643/capital-one-equifax-data-breach-social-security/.
[20] *Id*.

68. For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, and it takes some individuals up to three years to learn that information.[21]

69. It is within this context that Plaintiffs and all other Class Members must now live with the knowledge that their PII is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market.

70. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

71. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

72. Identity thieves can also use an individual's personal data and PII to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent

[21] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. SYSTEMICS, CYBERNETICS & INFORMATICS 9 (2019) http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's information, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant issued in the victim's name.[22]

73. One example of criminals piecing together bits and pieces of compromised PII to create comprehensive dossiers on individuals is called "Fullz" packages.[23] These dossiers are both shockingly accurate and comprehensive. With "Fullz" packages, cybercriminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals. For example, they can combine the stolen PII, and with unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

74. The development of "Fullz" packages means that the PII exposed in the Data Breach can be linked to other information about Plaintiffs and Class Members that is available on the internet. Even where a particular data element is not included in stolen files, criminals can

---

[22] *Identity Theft and Your Social Security Number,* SOCIAL SECURITY ADMINISTRATION, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf. (last visited July 9, 2025).

[23] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.,* Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm,* KREBS ON SECURITY (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm.

combine compromised PII with other sources to create more complete dossiers, increasing the risk of fraud, targeted contacts, and identity theft.

75. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[24]

76. Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good." Timely and accurate information about the Data Breach is therefore essential to Plaintiffs' and Class Members' ability to protect their PII and mitigate the harm caused by the Data Breach.

77. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

78. In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their PII. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

79. Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII. To protect themselves, Plaintiffs and Class Members will need to remain vigilant for years or even decades to come.

---

[24] *2019 Internet Crime Report* (Feb. 11, 2020) FED. BUREAU OF INVESTIGATION, https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last visited July 9, 2025).

***Defendant Knew—Or Should Have Known—of the Risk of a Data Breach***

80. Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

81. In 2024, the Identity Theft Resource Center reported 3,158 data compromises and approximately 1,350,835,988 victim notices—a 211% increase in victim notices over the prior year.[25]

82. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant.

***Defendant Could Have Prevented the Data Breach***

83. Data breaches are preventable.[26] Indeed, the American Bar Association published a treatise titled the *Data Breach and Encryption Handbook* wherein the author explained that:

a. "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[27]

b. "Organizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised[.]"[28]

c. "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and

---

[25] *2024 Data Breach Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf.
[26] Lucy L. Thomson, *Despite the Alarming Trends, Data Breaches Are Preventable*, DATA BREACH AND ENCRYPTION HANDBOOK (2012).
[27] *Id.* at 17.
[28] *Id.* at 28.

procedures . . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs." [29]

***Defendant Failed to Follow FTC Guidelines***

84. According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making. Thus, the FTC issued numerous guidelines identifying best data security practices that businesses—like Defendant—should use to protect against unlawful data exposure.

85. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use.[30] The FTC declared that, *inter alia*, businesses must:

a. protect the personal customer information that they keep;

b. properly dispose of personal information that is no longer needed;

c. encrypt information stored on computer networks;

d. understand their network's vulnerabilities; and

e. implement policies to correct security problems.

86. The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

87. Furthermore, the FTC explains that companies must:

a. not maintain information longer than is needed to authorize a transaction;

---

[29] *Id.*

[30] *Protecting Personal Information: A Guide for Business,* FED TRADE COMMISSION (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_protecting-personal-information.pdf.

b. limit access to sensitive data;

c. require complex passwords to be used on networks;

d. use industry-tested methods for security;

e. monitor for suspicious activity on the network; and

f. verify that third-party service providers use reasonable security measures.

88. The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

89. In short, Defendant's failure to use reasonable and appropriate measures to protect against unauthorized access to its employees and other individuals' data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendant Failed to Follow Industry Standards***

90. Several best practices have been identified that—at a *minimum*—should be implemented by businesses like Defendant. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

91. Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers;

monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

92. Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR.DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

93. These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendant opened the door to the criminals—thereby causing the Data Breach.

## CLASS ACTION ALLEGATIONS

94. Plaintiffs bring this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following class:

> All individuals residing in the United States whose PII was compromised in the Data Breach involving GardaWorld publicly reported in October 2026.

95. Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

96. Plaintiffs reserve the right to amend the class definition.

97. Plaintiffs and Class Members constitute a well-defined community of interest—they are similarly situated persons and were similarly affected and damaged by the alleged conduct of Defendant.

98. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on class-wide bases using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

99. Ascertainability. All members of the proposed Class are readily ascertainable from information in Defendant's custody and control, including the records maintained in the affected systems and the results of Defendant's investigation.

100. Numerosity. The Class Members are so numerous that joinder of all Class Members is impracticable. Upon information and belief, the proposed Class includes more than one hundred members.

101. Typicality. Plaintiffs' claims are typical of Class Members' claims as each arises from the same Data Breach, the same alleged misconduct by Defendant, and the same failure to reasonably safeguard PII.

102. Adequacy. Plaintiffs will fairly and adequately protect the proposed Class's common interests. Their interests do not conflict with Class Members' interests. And Plaintiffs have retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

103. Commonality and Predominance. Plaintiffs' and the Class's claims raise predominantly common fact and legal questions—which predominate over any questions affecting individual Class Members—for which a class wide proceeding can answer for all Class Members. In fact, a class wide proceeding is necessary to answer the following questions:

a. if Defendant had a duty to use reasonable care in safeguarding Plaintiffs' and the Class's PII;

b. if Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. if Defendant was negligent in maintaining, protecting, and securing PII;

d. if Defendant breached contract promises to safeguard Plaintiffs and the Class's PII;

e. if Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

f. whether Defendant provided reasonably timely and adequate information concerning the Data Breach;

g. if the Data Breach caused Plaintiffs and the Class injuries;

h. what the proper damages measure is; and

i. whether Plaintiffs and the Class are entitled to damages, restitution, declaratory relief, or injunctive relief.

104. Superiority. A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that individual litigation against Defendant would require. Thus, it would be practically impossible for Class Members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or

contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

105. Certification is appropriate under Rule 23(b)(3) because common questions of law and fact predominate over individual questions and a class action is superior to other available methods of adjudication. Certification of a class seeking injunctive or declaratory relief is also appropriate under Rule 23(b)(2) because Defendant acted or refused to act on grounds generally applicable to the Class.

## FIRST CAUSE OF ACTION
**Negligence**
**(On Behalf of Plaintiffs and the Class)**

106. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

107. Plaintiffs and the Class entrusted their PII to Defendant on the premise and with the understanding that Defendant would safeguard their PII, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

108. Defendant owed a duty of care to Plaintiffs and Class Members because it was foreseeable that Defendant's failure—to use adequate data security in accordance with industry standards for data security—would compromise their PII in a data breach. And here, that foreseeable danger came to pass.

109. Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and the Class could and would suffer if their PII was wrongfully disclosed.

110. Defendant owed these duties to Plaintiffs and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew

or should have known would suffer injury-in-fact from Defendant's inadequate security practices. After all, Defendant actively sought and obtained Plaintiffs and Class Members' PII.

111. Defendant owed—to Plaintiffs and Class Members—at least the following duties to:

a. exercise reasonable care in handling and using the PII in its care and custody;

b. implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized access;

c. promptly detect attempts at unauthorized access;

d. notify Plaintiffs and Class Members within a reasonable timeframe of any breach to the security of their PII.

112. Thus, Defendant owed a duty to timely and accurately disclose to Plaintiffs and Class Members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiffs and Class Members to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

113. Defendant also had a duty to exercise appropriate clearinghouse practices to remove PII it was no longer required to retain under applicable regulations.

114. Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiffs and the Class involved an unreasonable risk of harm to Plaintiffs and the Class, even if the harm occurred through the criminal acts of a third party.

115. Defendant's duty to use reasonable security measures also arose from its undertaking to collect, maintain, and protect the confidential PII of Plaintiffs and the Class in connection with its business operations and related GardaWorld relationships.

116. Under the FTC Act, 15 U.S.C. § 45, Defendant had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiffs and Class Members' PII.

117. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiffs and the Class Members' sensitive PII.

118. Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

119. Defendant breached its duties by failing to use reasonable measures to protect PII and failing to comply with applicable data-security standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII it collected and stored and the foreseeable consequences of unauthorized disclosure.

120. The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Defendant holds vast amounts of PII, it was inevitable that

unauthorized individuals would attempt to access Defendant's databases containing the PII — whether by malware or otherwise.

121. PII is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiffs and Class Members and the importance of exercising reasonable care in handling it.

122. Defendant improperly and inadequately safeguarded the PII of Plaintiffs and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

123. Defendant breached these duties as evidenced by the Data Breach.

124. Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs' and Class Members' PII by:

a. disclosing and providing access to this information to third parties and

b. failing to properly supervise both the way the PII was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

125. Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII of Plaintiffs and Class Members which actually and proximately caused the Data Breach and Plaintiffs and Class Members' injury.

126. Defendant further breached its duties by failing to provide Plaintiffs and Class Members with reasonably timely and accurate information concerning unauthorized access to their PII, impairing their ability to mitigate the resulting harm.

127. On information and belief, the PII of Plaintiffs and the Class was wrongfully accessed and disclosed to unauthorized persons because of the Data Breach.

128. As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiffs and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

129. And, on information and belief, Plaintiffs' PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

130. Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiffs and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII by criminals, improper disclosure of their PII, lost benefit of their bargain, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

**SECOND CAUSE OF ACTION**
**Negligence *per se***
**(On Behalf of Plaintiffs and the Class)**

131. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

132. Under the FTC Act, 15 U.S.C. § 45, Defendant had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' PII.

133. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII entrusted to it. The FTC

publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiffs and the Class Members' sensitive PII.

134. Defendant breached its respective duties to Plaintiffs and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard PII.

135. Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

136. The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and members of the Class.

137. But for Defendant's wrongful and negligent breach of its duties owed, Plaintiffs and Class Members would not have been injured.

138. The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Defendant's breach of their duties. Defendant knew or should have known that Defendant was failing to meet its duties and that its breach would cause Plaintiffs and members of the Class to suffer the foreseeable harms associated with the exposure of their PII.

139. Defendant's various violations and its failure to comply with applicable laws and regulations constitute negligence per se.

140. As a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

**THIRD CAUSE OF ACTION**
**Breach of Implied Contract**
**(On Behalf of Plaintiffs and the Class)**

141. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

142. Plaintiffs and Class Members provided their PII, directly or through related GardaWorld entities, in connection with their relationships with GardaWorld. In requesting, accepting, and retaining that information for its business purposes, Defendant undertook to safeguard the information and use it only for authorized purposes.

143. Plaintiffs and Class Members reasonably understood that a portion of the resources derived from Defendant's business operations would be used to pay for adequate cybersecurity measures.

144. Plaintiffs and Class Members reasonably understood that Defendant would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

145. Plaintiffs and Class Members accepted Defendant's undertaking by permitting the collection and use of their PII for authorized purposes in connection with their relationships with GardaWorld.

146. In turn, and through internal policies, Defendant agreed to protect and not disclose the PII to unauthorized persons.

147. Through its privacy representations and conduct, Defendant represented that it would protect Plaintiffs' and Class Members' PII against unauthorized disclosure.

148. Implicit in the parties' agreement was that Defendant would provide Plaintiffs and Class Members with prompt and adequate notice of all unauthorized access and/or theft of their PII.

149. After all, Plaintiffs and Class Members would not have entrusted their PII to Defendant in the absence of such an agreement with Defendant.

150. Plaintiffs and the Class fully performed their obligations under the implied contracts with Defendant.

151. The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

152. Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

153. Defendant materially breached the contracts it entered with Plaintiffs and Class Members by:

a. failing to safeguard their information;

b. failing to notify them promptly of the intrusion into its computer systems that compromised such information.

c. failing to comply with industry standards;

d. failing to comply with the legal obligations necessarily incorporated into the agreements; and

e. failing to ensure the confidentiality and integrity of the electronic PII that Defendant created, received, maintained, and transmitted.

154. In these and other ways, Defendant violated its duty of good faith and fair dealing.

155. Defendant's material breaches were the direct and proximate cause of Plaintiffs' and Class Members' injuries (as detailed *supra*).

156. And, on information and belief, Plaintiffs' PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

157. Plaintiffs and Class Members performed as required under the relevant agreements, or such performance was waived by Defendant's conduct.

## **FOURTH CAUSE OF ACTION**
**Invasion of Privacy**
**(On Behalf of Plaintiffs and the Class)**

158. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

159. Plaintiffs and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential PII and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

160. Defendant owed a duty to its employees and other individuals, including Plaintiffs and the Class, to keep this information confidential.

161. The unauthorized acquisition (i.e., theft) by a third party of Plaintiffs and Class Members' PII is highly offensive to a reasonable person.

162. The intrusion was into a place or thing which was private and entitled to be private. Plaintiffs and the Class disclosed their sensitive and confidential information to Defendant, but did

so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiffs and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

163. The Data Breach constitutes an intentional interference with Plaintiffs' and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

164. Defendant acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

165. On information and belief, Defendant knowingly failed to provide Plaintiffs and the Class with reasonably timely and adequate information concerning unauthorized access to their PII, thereby materially impairing their mitigation efforts.

166. Acting with knowledge, Defendant had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiffs and the Class.

167. As a proximate result of Defendant's acts and omissions, the private and sensitive PII of Plaintiffs and the Class was stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiffs and the Class to suffer damages (as detailed *supra*).

168. And, on information and belief, Plaintiffs' PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

169. Unless and until enjoined and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their PII is still maintained by Defendant with its inadequate cybersecurity system and policies.

170. Plaintiffs and the Class have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendant's inability to safeguard the PII of Plaintiffs and the Class.

171. In addition to injunctive relief, Plaintiffs, on behalf of themselves and the other Class Members, also seek compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

## FIFTH CAUSE OF ACTION
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

172. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

173. This claim is pleaded in the alternative to the breach of implied contract claim.

174. Plaintiffs and Class Members conferred a benefit upon Defendant by providing PII that Defendant used and retained in connection with its business operations. Defendant obtained economic benefits from the collection, maintenance, and use of that information.

175. Defendant appreciated or had knowledge of the benefits it received from Plaintiffs and Class Members.

176. Plaintiffs and Class Members reasonably understood that Defendant would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

177. Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' PII.

178. Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Defendant instead calculated to avoid its data security obligations at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

179. Under principles of equity and good conscience, Defendant should not be permitted to retain benefits obtained from the use of Plaintiffs' and Class Members' PII while failing to provide the reasonable data security it undertook to furnish.

180. Plaintiffs and Class Members have no adequate remedy at law.

181. Defendant should be compelled to disgorge into a common fund—for the benefit of Plaintiffs and Class Members—all unlawful or inequitable proceeds that it received because of its misconduct.

## SIXTH CAUSE OF ACTION
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiffs and the Class)**

182. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

183. Given the relationship between Defendant and Plaintiffs and Class Members, where Defendant became guardian of Plaintiffs' and Class Members' PII, Defendant became a fiduciary by its undertaking and guardianship of the PII, to act primarily for Plaintiffs and Class Members, (1) for the safeguarding of Plaintiffs and Class Members' PII; (2) to timely notify Plaintiffs and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

184. Defendant has a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of Defendant's relationship with them—especially to secure their PII.

185. Because of the highly sensitive nature of the PII, Plaintiffs and Class Members would not have entrusted Defendant, or anyone in Defendant's position, to retain their PII had they known the reality of Defendant's inadequate data security practices.

186. Defendant breached its fiduciary duties to Plaintiffs and Class Members by failing to sufficiently encrypt or otherwise protect Plaintiffs' and Class Members' PII.

187. Defendant also breached its fiduciary duties to Plaintiffs and Class Members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

188. As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

**SEVENTH CAUSE OF ACTION**
**Declaratory Judgment**
**(On Behalf of Plaintiffs and the Class)**

189. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

190. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

191. In the fallout of the Data Breach, an actual controversy has arisen about Defendant's various duties to use reasonable data security. On information and belief, Plaintiffs

allege that Defendant's actions were—and *still* are—inadequate and unreasonable. And Plaintiffs and Class Members continue to suffer injury from the ongoing threat of fraud and identity theft.

192. Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendant owed—and continues to owe—a legal duty to use reasonable data security to secure the data entrusted to it;

b. Defendant has a duty to provide reasonably timely and accurate information concerning the Data Breach under its common-law obligations and applicable law;

c. Defendant breached, and continues to breach, its duties by failing to use reasonable measures to protect the data entrusted to it; and

d. Defendant's breaches of its duties caused—and continue to cause—injuries to Plaintiffs and Class Members.

193. The Court should also issue corresponding injunctive relief requiring Defendant to use adequate security consistent with industry standards to protect the data entrusted to it.

194. If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury and lack an adequate legal remedy if Defendant experiences another data breach.

195. And if another breach occurs, Plaintiffs and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages—while warranted for out-of-pocket damages and other legally quantifiable and provable damages—cannot cover the full extent of Plaintiffs and Class Members' injuries.

196. If an injunction is not issued, the resulting hardship to Plaintiffs and Class Members far exceeds the minimal hardship that Defendant could experience if an injunction is issued.

197. An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiffs, Class Members, and the public at large.

**PRAYER FOR RELIEF**

Plaintiffs and Class Members respectfully request judgment against Defendant and that the Court enter an order:

A. Certifying this case as a class action on behalf of Plaintiffs and the proposed Class, appointing Plaintiffs as class representatives, and appointing their counsel to represent the Class;

B. Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiffs and the Class;

C. Awarding injunctive relief as necessary to protect the interests of Plaintiffs and the Class;

D. Awarding Plaintiffs and the Class damages including applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

E. Awarding restitution and damages to Plaintiffs and the Class in an amount to be determined at trial;

F. Awarding attorneys' fees and costs, as allowed by law;

G. Awarding prejudgment and post-judgment interest, as provided by law;

H. Granting Plaintiffs and the Class leave to amend this complaint to conform to the evidence produced at trial; and

I. Granting other relief that this Court finds appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial for all claims so triable.

Dated: October 21, 2026

By: /s/ Raina C. Borrelli
Raina C. Borrelli*
**STRAUSS BORRELLI PLLC**
One Magnificent Mile
980 N. Michigan Avenue, Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
raina@straussborrelli.com

**Pro Hac Vice forthcoming*

*Attorneys for Plaintiff and the Proposed Class*